**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **JOSEPH ROUSSEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 1:22-cv-00285** |
| | ) | |
| **WILLIAM MAYO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>DEFENDANT ROBERT YOUNG'S MOTION FOR SUMMARY JUDGMENT</u>**

The Defendant, Robert Young, acting through his undersigned attorneys, hereby moves for summary judgment in his favor pursuant to Federal Rule of Civil Procedure 56.

**<u>FACTUAL BACKGROUND</u>**

The Plaintiff, Joseph Roussel, is a resident of the town of Orrington, which is located in Penobscot County, Maine. SMF 1. In an October 2021 telephone call, Roussel had an argument with Defendant William Mayo, the City Manager of the City of Old Town, Maine. SMF 2, 5. The argument concerned COVID precautions at the Old Town City Office and escalated to the point that Roussel and Mayo "traded adult language insults" at each other. *Id.* Shortly thereafter, the Old Town Police Department issued a criminal trespass warning against Roussel which directed him not to enter the Old Town City Office. SMF 69.

Mayo owns a home on Schoodic Lake in the municipality of Lakeview Planation, which is located in Piscataquis County. SMF 4. On June 25, 2022, Roussel was on a boat on Schoodic Lake with friends. SMF 6. One of Roussel's friends pointed out Mayo's home on the lake shore, at which point Roussel suddenly yelled out at Mayo from the boat, shouting "Fuck you! Try trespassing me from here you tyrant piece of shit!" *Id.*; SMF 71. Approximately one week later, on July 3, 2022,

Roussel posted at least five signs directed at Mayo along Railroad Bed Road and Hancock Road in Lakeview Plantation. SMF 7, 34. Both are private roads located near Mayo's home. *Id.*; SMF 11, 15. The signs that Roussel posted contained the following messages:

- "FUCK YOU WILLIAM MAYO" (SMF 19);

- "WILLIAM MAYO HATES FREE SPEECH RIGHTS AND LAWS MATTER MORE THAN YOUR FEELINGS SUCK IT." (SMF 20);

- "SOMETIMES WHEN YOUR [sic] A TYRANT AT WORK THEY FIGURE OUT WHERE YOU LIVE AND SCOTT WILCOX CANT [sic] HELP."[1] (SMF 21);

- "WILLIAM MAYO SUPPORTS BIDEN, ANOTHER SHIT BAG THAT HATES FREEDOM. THE CONSTITUTION MATTERS MORE THAN YOUR LIMP DICK." (SMF 22);

- "FREEDOM OF SPEECH MATTERS MOST WHEN YOU DON'T LIKE IT. FUCK YOU WILLIAM MAYO EAT A BAG OF DICKS." (SMF 23).

Shortly after he posted the signs, Roussel claims that Mayo sent him an email in which Mayo erroneously stated that the roads where Roussel posted the signs were private. SMF 36. Approximately two weeks later, on July 14, 2022, a Piscataquis County Sheriff's Deputy served Roussel with a cease harassment warning that cited Maine's criminal harassment statute, 17-A M.R.S. § 506-A, and stated that "You are forbidden from engaging, without reasonable cause, in any course of conduct with the intent to harass, torment or threaten the following person: William Bill Mayo." SMF 37, 38.

Defendant Robert Young is the Sheriff of Piscataquis County, Maine. SMF 3. Roussel called Young on the telephone in July 2022, approximately one month after he was served with the

---

[1] Defendant Scott Wilcox was the police chief of Old Town during the events at issue in this case. SMF 69.

cease harassment notice. SMF 58. During the course of their telephone call, Young told Roussel that the First Amendment is not an absolute right and that he believed that Roussel's signs were not protected by the First Amendment because of the nature of the language they contained, the fact that Roussel went onto private property to post the signs, and the fact that he hollered obscenities at Mayo from the boat on Schoodic Lake. SMF 59. Roussel alleges that Young also "upheld . . . a verbal trespass from Mr. Mayo" and told him "not to go back out there," referring to Railroad Bed Road. SMF 74.

Rousell claims that the cease harassment notice constituted a prior restraint of his right to access public property as well as his First Amendment rights and was also an act of First Amendment retaliation. SMF 71. Roussel also claims that the cease harassment notice infringed his fundamental constitutional rights and "continues to chill" his First and Fourteenth Amendment rights. SMF 72. Roussel brings this action pursuant to 42 U.S.C. § 1983 and 5 M.R.S. § 4682, alleging a violation of his First Amendment rights and First Amendment retaliation.[2] SMF 77. He is suing Young in his individual and official capacities. SMF 78.

## LEGAL ANALYSIS

### I.  INDIVIDUAL LIABILITY

#### A.  SECTION 1983 FIRST AMENDMENT VIOLATION

##### (1)  The Legal Standard

To prove a claim under 42 U.S.C. § 1983, Roussel must demonstrate that: (1) Young deprived Roussel of a right secured by the Constitution or a federal statute, and (2) that he acted under color of state law. *West v. Atkins,* 487 U.S. 42, 48 (1988). *See also, Gutierrez-Rodriguez v.*

---

[2] Roussel's two federal claims control two accompanying state law claims that he brought under the Maine Civil Rights Act because the MCRA is patterned on 42 USC § 1983. *Forbis v. City of Portland,* 270 F.2d 57, 61 (D. Me. 2003) (citing *Jenness v. Nickerson,* 637 A.2d 1152, 1158 (Me. 1994)).

*Cartagena,* 882 F.2d 553, 559 (1ˢᵗ Cir. 1989), *Cruz-Erazo v. Rivera-Montañez,* 212 F.3d 617, 621 (1ˢᵗ Cir. 2001). It is undisputed that Young was acting under color of state law during the events at issue in this case. Thus, Young will focus on the first element: whether Young deprived Roussel of a Constitutional right, specifically, his First Amendment right of free speech.

Roussel must show that Young intended to inhibit speech protected by the First Amendment and that any alleged adverse action would not have occurred "but for" Young's intent to interfere with his freedom of speech. *Tatro v. Kervin,* 41 F.3d 9, 18 (1st Cir.1994).

### (2)    Roussel's Speech Was Not Constitutionally Protected

Roussel's claims of a § 1983 First Amendment violation must fail because the speech in question was not constitutionally protected, for the reasons discussed below.

### (a) The Roads At Issue Are Not Traditional Public Fora

Whether a restriction on speech is constitutionally valid depends in part on the nature of the forum in which a restriction applies. *New England Regional Council of Carpenters v. Kinton,* 284 F.3d 9, 20 (1ˢᵗ Cir. 2002) (citing *Perry Educ. Ass'n v. Perry Local Educ. Ass'n,* 460 U.S. 37, 44-46 (1983)). "Some spaces—such as public streets, sidewalks, and parks—are presumptively public fora, and in most cases no particularized inquiry into their precise nature is necessary." *Id.* (citing *Frisby v. Schultz,* 487 U.S. 474, 480 (1988)).

The First Circuit has held that "[t]he problem of classification grows increasingly difficult in instances in which no presumption is available, and categorical distinctions are of little help in borderline cases." *Id.* (citing *See, e.g., Int'l Society for Krishna Consciousness, Inc v. Lee (ISKON),* 505 U.S. 672, 681–82). "In the end, an inquiring court must examine the nature of the locus, as well as its history, to determine whether it qualifies as a traditional public forum." *Id.*

(citation omitted). Here, the record demonstrates that the nature of Railroad Bed Road and Hancock Road are *not* traditional public fora.

### (i)      The Roads At Issue Are Privately Owned

Roussel testified that he thought Railroad Bed Road was a public road "according to the town and the registry [of deeds]," SMF 8. Yet he also conceded that his understanding of the documents from the registry of deeds was "limited." SMF 9. Roussel also testified that "Hancock Road is "privately owned but accessible to the public," before adding a caveat that this was "from what [he] understand[s]." SMF 10.

The court should disregard Roussel's testimony as to the legal status of both roads, because it constitutes improper lay opinion under Federal Rule of Evidence 701. Rule 701 permits  lay opinion testimony only when it is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." F.R.Evid. 701. Yet Roussel's testimony contains no explanation for how his statements concerning the ownership of Railroad Bed Road or Hancock Road are rationally based on his own perception. *See* SMF 9, 10. Not only does Roussel's testimony fail to assert that his opinions on the status of the two roads are not based on technical or specialized knowledge of property law, he actually admits to a "limited" understanding. SMF 9, 10.

Other courts have refused to consider similar lay opinions concerning the title of another. *See Arnold v. United States,*  137 Fed. Cl. 524, 558 (2018) (court would not consider affiant's statements regarding land ownership at summary judgment because statements contained unsupported legal conclusions and affiant did not explain how his statements were rationally based on events he perceived); Alcarmen v. J.P. Morgan Chase Bank, No. 13-CV-1575 YGR, 2014 WL

3368647, at *1 (N.D. Cal. July 8, 2014) (court refused to consider "Mortgage Loan Chain of Title Report" at summary judgment because, among other reasons, document was "replete with speculation" and "document is inadmissible to the extent it contains legal arguments and lay opinions, of which it contains many").

In contrast to Roussel's testimony, the record evidence demonstrates that both roads are in fact privately owned, with no public easement rights in either Railroad Bed Road or Hancock Road being held at the municipal, county, or state level. SMF 11-18. The record evidence further demonstrates that Roussel, personally, never held an ownership interest in either road, nor in any property benefitted by any private rights in the two roads in question. SMF 14, 18. Weighed against Roussel's admission of a limited understanding of chain of title to Railroad Bed Road and Hancock Road, the record evidence does not support any finding that a genuine issue of material fact that the public has any ownership interest in either road.

(ii)    **The Roads At Issue Do Not Function As Traditional Public Fora**

While the property records demonstrate that Railroad Bed Road and Hancock Road are privately owned, SMF 11-18, federal courts such as the 6th Circuit have ruled that a street does not lose its status as a traditional public forum simply because it is privately owned. *Brindley v. City of Memphis, TN,* 934 F.3d 461, 468 (6th Cir. 2019). "If a privately owned street (1) is physically indistinguishable from a public street and (2) functions like a public street, then it is a traditional public forum." *Id.* at 469.

Where courts have held that a privately owned street constitutes a traditional public forum, it has involved sidewalks which the court determined "blended into the urban grid." *United Church of Christ v. Gateway Econ. Dev. Corp. of Greater Cleveland,* 383 F.3d 449, 452-53 (6th Cir. 2004); *McGlone v. Bell,* 681 F.3d 718, 733 (6th Cir. 2012) ("Because the perimeter sidewalks at the

university blend into the urban grid and are physically indistinguishable from public sidewalks, they constitute traditional public fora.").  Thus, in *Brindley,* a privately-owned street leading to a business park was held to be a traditional public forum because it "blend[ed] into the urban grid by virtue of its direct intersection with Summer Avenue, a busy public thoroughfare," and because the private road afforded the general public access to a gas station, a church, and a U.S. Immigration and Customs Enforcement office, among other public places. *Brindley,* 934 F.3d at 469 ("the photos of the [private street] in the record demonstrate that a reasonable member of the public visiting one of the many buildings on the street would encounter nothing to indicate that he or she had turned onto a private drive.").

In contrast to *Brindley,* photographs in the record here, which were taken by Roussel himself, do not demonstrate that that a reasonable member of the public would turn onto Railroad Bed Road or Hancock Road in order to visit a local business or a public accommodation. SMF 25, 26. The photos depict a rural landscape with no sidewalks, no businesses, and no public accommodations such as would be found in the "urban grid" type properties discussed by the 6th Circuit in *Brindley*. SMF 26. To the contrary, the photographs in the record depict a roadside that has more in common with areas that other courts have determined *not* to be public fora. For example, the U.S. District Court for the Southern District of Florida concluded that a "green space abutting two roadways" was not traditional public forum because it was "not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use," and where the space had "no buffers such as sidewalks for protection or apparent invitation to the public[.]" *Snowden v. Town of Bay Harbor Islands,* 358 F. Supp. 2d 1178, 1193 (S.D. Fla. 2004). *See also, United States v. Kokinda,* 497 U.S. 720, 728 (1990) (rejecting the notion that "all sidewalks open to the public" are public fora);

*McDonald v. City of Pompano Beach, Florida,* 2024 WL 3566471, at * 25 (S.D. Fla. July 29, 2024).

It is also noteworthy that several road signs depicted in the photographs are directed specifically at all-terrain vehicles and snowmobiles and explicitly state that use of the road is a "privilege." SMF 25 (citing Exhibit # 12 ("ATVs PLEASE SLOW DOWN OR LOSE THE PRIVILEGE OF USING THIS ROAD"). Other signs contain ATV pictograms and ATV trail guidance. SMF 25 (citing Exhibit # 11 ("RIDE RIGHT ON PAVEMENT"); Exhibit # 13; Exhibit #14 (referring to "Connector Trail" and depicting a map)). The fact that at least one sign directed at ATVs and snowmobiles refers to the use of the road as a "privilege," taken in conjunction with the fact that it is unlawful to operate either an ATV or a snowmobile on a public way, 12 M.R.S. §§ 13106-A(5) and 13157-A(6), is compelling evidence that Railroad Bed Road and Hancock Road are not physically indistinguishable from a public street and do not function as a public road. *See Brindley,* 934 F.3d at 469.

### (iii)    <u>One Photo Depicting a Trump/Pence Sign Is Shown in a Private Driveway</u>

Defendant Young anticipates that the Plaintiff will cite one photo in the record depicting a Trump/Pence yard sign and assert that it demonstrates that Railroad Bed Road saw political signs posted along the roadside, making it a traditional public forum. Exhibit #9. The photograph does no such thing. Roussel testified at his deposition that this was a sign that his friends Patty and Dan Hesseltine "had at the top of the driveway." SMF 27, 28. He further acknowledged that "this is the Hesseltines' driveway" and that "the Hesseltines posted this on their own property." SMF 29. Without explanation, Roussel then contradicted himself a moment later to say that that the sign was not on the driveway, but "technically in the road." SMF 30.

This latter statement that the sign "is technically in the road" constitutes impermissible lay opinion testimony because Roussel offered no explanation for how it was rationally based on his own perception. *See* SMF 30. Thus, his statements amount to opinions requiring technical or specialized knowledge, which other courts have refused to consider. *See Arnold,* 137 Fed. Cl. at 558.

Other than Roussel's contradictory testimony, nowhere in the record is there any evidence that this sign was posted by anyone other than the Hesseltines on their own driveway.[3] Thus, this photograph does not create a genuine dispute of material fact concerning Railroad Bed Road's status as something less than a public forum, particularly when weighed against the other record evidence demonstrating that Railroad Bed Road is privately owned, SMF 11-18; used for the limited purpose of riding ATVs and snowmobiles, Exhibits 11, 13, 14; and posted with signs directed such ATV and snowmobile traffic calling the use of the road a "privilege," Exhibit 12.

### (b)    **Roussel's Speech Constituted Harassment Because It Was "One-to One Speech" Between Himself and Mayo**

The Supreme Court has recognized that the government may impose content-based restrictions on speech "when confined to [a] few historic and traditional categories," including incitement, obscenity, defamation, speech integral to criminal conduct, so-called fighting words, child pornography, fraud, true threats, and speech presenting some grave and imminent threat the government has the power to prevent." *United States v. Alvarez,* 567 U.S. 709, 132 S.Ct. 2537, 183 L.Ed.2d 574 (2012).

It is anticipated that Roussel will argue that his language did not fall into this proscribed category of speech because "there was no simultaneous, interpersonal communication, nor any

---

[3] Roussel testified that the Hesseltines live on Railroad Bed Road, SMF 31, and thus this photograph does not concern Hancock Road.

claim that imminent violence leading to a breach of peace was anticipated." ECF No. 48 at 11-12 (citing *Brandenburg v. Ohio,* 395 U.S. 444 (1969); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 927 (1982). In other words, Roussel will contend that he was not threatening or harassing Mayo because he did not confront Mayo face-to-face and did not come within 1,200 feet of Mayo's residence.[4] *Id.* at 12.

Yet threats of "imminent violence" or a face-to-face confrontation are not necessary prerequisites for speech to fall outside constitutional protection: "Although the Supreme Court has never squarely addressed the issue in the context of harassment or abuse, the Court appears to distinguish between repeated unwanted one-to-one speech to a target, which the government may generally prohibit, and one-to-many speech about a target, which the government generally may not prohibit." *McCurdy v. Maine,* 2020 WL 1286206, at *8 (D. Me. March 18, 2020) (appeal denied by *McCurdy v. State,* 2020 WL 10111002 (1st Cir. Nov. 10, 2020).

Here, the evidence demonstrates that Roussel's speech was one-to-one speech, directed personally at Mayo at his residence. Roussel admits that he shouted a stream of obscenities at Mayo, specifically, from a boat on Schoodic Lake. SMF 6 (Q: "You're out . . . enjoying the weather with family and friends and somebody points out to you where Mr. Mayo lives and all of a sudden you yell those expletives *at him*?" A: "Correct.") (emphasis added). Roussel admits that the signs that he posted by Mayo's residence in Lakeview Plantation were "directed toward" Mayo, specifically. SMF 34. Roussel also testified that in addition to the signs he posted by Mayo's residence, he made more signs containing messages that he "had intended to express *to Mr. Mayo*." SMF 35 (emphasis added) (Q: "[T]he purpose of spending a week making these signs in your garage was to go out there and place them near where Mr. Mayo lived, right?" A: "That's correct.").

---

[4] Mayo estimates that Roussel came within 30 feet of his property while shouting obscenities at him from a boat on Schoodic Lake. SMF 76.

*See also*, SMF 21; Exh. # 3 (sign stating "SOMETIMES WHEN YOUR [sic] A TYRANT AT WORK THEY FIGURE OUT WHERE YOU LIVE AND SCOTT WILCOX CANT HELP.").

### (c)    Roussel's Speech Was "Intrusive" Speech and Thus Is Not Constitutionally Protected

The fact that Roussel targeted Mayo near his residence also renders his speech constitutionally unprotected. SMF 32, 33. The Supreme Court has held that "the First Amendment permits the government to prohibit offensive speech as intrusive when the captive audience cannot avoid the objectionable speech." *Frisby v. Schultz,* 487 U.S. 474, 487 (1988) (citing *Consolidated Edison Co. v. Public Service Comm'n of New York,* 447 U.S. 530, 542 (1980)). The Court further held that "[t]he target of focused picketing . . . is just such a captive." *Id.* (quotation omitted). That Roussel was acting alone does not change the analysis because "even a solitary picket can invade residential privacy." *Id.*

The fact that Roussel posted his signs, which contained obscene and derisive language addressed to Mayo personally, to utility poles and trees near Mayo's residence rendered Mayo unable to avoid the speech. SMF 33; Exhibits 1-7. *See also Frisby,* 487 U.S. at 487.

### (3)    Young Did Not Intend to Inhibit Protected Speech.

As discussed above, in addition to demonstrating that Young deprived him of a constitutional right while acting under color of state law, Roussel must also demonstrate that Young intended to inhibit speech protected by the First Amendment and that any alleged adverse action would not have occurred "but for" Young's intent to interfere with his freedom of speech. *Tatro,* 41 F.3d at 18. Young's testimony is strong evidence that he did *not* intend to inhibit Roussel's protected speech. Instead, the record demonstrates Young's belief that Roussel had trespassed onto private property and directed offensive and derisive speech at Mayo in violation of Maine's disorderly conduct statute.

For example, Young testified that he believed that Railroad Bed Road was a private road based upon his experience working in the area over many years. SMF 40. Young also testified that he understood Roussel to have posted signs along a private camp road "going off the Railroad Bed Road into [Mayo's] camp." SMF 41. *See also* SMF 42, 43 ("it was given to me as signs posted on his private road, on the private road that he utilizes."). Based upon these understandings, Young believed that Roussel only had a right to use Railroad Bed Road if he was invited to use it and that, even if invited to use the road, Roussel had no right to harass anyone. SMF 43.

Young also believed that Roussel had previously violated Maine's disorderly conduct statute, 17-A M.R.S. § 501-A, by accosting Mayo from a boat on Schoodic Lake and directing obscenities at him. SMF 45.

Furthermore, Young did not believe that the use of the word "fuck" is absolutely protected by the First Amendment. SMF 50. Taking two of Roussel's signs as an example, Young believed that Roussel's sign stating, "FUCK YOU, WILLIAM MAYO," could be a violation of 17-A M.R.S. § 501-A. SMF 52, 53. Likewise, he believed that Roussel used "offensive, derisive, or annoying" language in violation of § 501-A when he posted sign stating, in part "THE CONSTITUTION MATTERS MORE THAN YOUR LIMP DICK." SMF 53, 54. Young also testified that he believed that Roussel's sign stating that "SOMETIMES WHEN YOUR [sic] A TYRANT AT WORK THEY FIGURE OUT WHERE YOU LIVE AND SCOTT WILCOX CANT HELP" could be perceived as a threat. SMF 60; Exhibit #8.[5]

In a telephone conversation approximately one month after he was served with the cease harassment notice, Roussel alleges that Young "upheld . . . a verbal trespass from Mr. Mayo" and told him "not to go back out there," referring to Railroad Bed Road. SMF 74. Roussel also contends

---

[5] Young did not issue a summons to Roussel for violating the disorderly conduct statute, nor any other type of summons. SMF 57,62-64.

that Young told him that he "likes to think what the ladies at his -- has to or likes to consider what the ladies at his church think," rather than the First Amendment. SMF 75. Young told Roussel that he believed that Roussel had overstepped a boundary and that his signs were not protected by the First Amendment because of the nature of the language they contained, the fact that Roussel went onto private property to post the signs, and the fact that he hollered obscenities at Mayo from the boat on Schoodic Lake. SMF 58, 59.

Even accepting Roussel's allegations as true for summary judgment purposes, no reasonable jury could find that Young intended to violate Roussel's First Amendment rights when he issued the cease harassment notice, nor that Young's desire to curb Roussel's protected expression was a motivating factor in issuing the notice or purportedly telling Roussel "not to go back out" to Railroad Bed Road. *Tatro,* 41 F.3d at 18. Instead, the record evidence demonstrates that Young was motivated by what he believed was Roussel's entry onto private roads, his use of obscenities, his use of threats, and his violation of the disorderly conduct statute. *See* SMF 40, 43, 45, 50, 52, 53, 54, 58, 59, 60. Stated differently, no reasonable jury could conclude that the cease harassment notice would not have been served or the warning not to return to Railroad Bed Road never delivered "but for" Young's intent to interfere with his freedom of speech, specifically. *Id.*

### B.    FIRST AMENDMENT RETALIATION

#### (1)    The Legal Standard

To prove a claim of First Amendment retaliation pursuant to 42 U.S.C. § 1983, Rousell must show that (1) he was engaged in constitutionally protected conduct; (2) he suffered an adverse action by Young; (3) his protected conduct was a substantial or motivating factor for the adverse action. *Gattineri v. Town of Lynnfield, Mass.,* 58 F.4th 512, 515 (1st Cir. 2023) (citing *Falmouth Sch. Dept. v. Doe on behalf of Doe,* 44 F.4th 23, 47 (1st Cir. 2022)).

Roussel must also demonstrate that Young's purported "retaliatory animus" was the "but-for" cause of Roussel's injuries, "meaning that the adverse action against him would not have been taken absent the retaliatory motive." *Id.* (quoting *Nieves v. Bartlett,* 587 U.S. 391, 398 (2019)).

### (2)    Roussel's Speech Was Not Constitutionally Protected

Defendant Young repeats and reasserts his argument above concerning the unprotected nature of Roussel's speech, both what was shouted at Mayo from Schoodic Lake and what was contained in the signs posted near Mayo's residence.

### (3)    Young Had No Retaliatory Animus

Roussel must show that Young had a "retaliatory animus" that was the "but-for" cause of his purported injuries, "meaning that the adverse action against [him] would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 398 (citing *Hartman v. Moore*, 547 U.S. 250, 259-60 (2006)). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Id.* (quotation omitted).

The reasons discussed above with regard to Young's lack of intent or motive to inhibit Roussel's First Amendment right to free speech apply equally to Roussel's First Amendment retaliation claim and Young repeats and reasserts them here.

### C.    QUALIFIED IMMUNITY

Even if the court determines that there is a genuine dispute of material fact concerning Roussel's First Amendment violation claim or his First Amendment retaliation claim, Young is nevertheless entitled to qualified immunity.

### (1)    The Legal Standard

Qualified immunity protects government officials from liability for civil damages to the extent that their conduct "does not violate clearly established statutory or constitutional rights of

14

which a reasonable person would have known." *Lopera v. Town of Coventry,* 640 F.3d 388, 396 (1ˢᵗ Cir. 2011) (quoting *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (other quotations omitted). The First Circuit follows a two-step analysis under *Pearson* in discerning whether defendants are entitled to qualified immunity. *Id.* The analysis asks "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009).

With regard to the first prong, Defendant Young references and incorporates his argument above that he did not violate Roussel's First Amendment rights because Roussel's speech was not constitutionally protected. With regard to the second prong of the analysis, the lack of any controlling authority addressing the specific facts of this case render any First Amendment right to post signs on roads such as Railroad Bed Road and Hancock Road as not clearly established.

Clearly established law must define the right allegedly violated in a "particularized sense" so that "the contours of the right are clear to a reasonable official." *Eves v. LePage,* 927 F.3d 575, 583 (1ˢᵗ Cir. 2019) (quoting *Reichle v. Howards,* 566 U.S. 658, 665 (2012) (quotation marks omitted). This is a "demanding standard," which requires that the law be "sufficiently clear that *every reasonable official* would understand that what he is doing is unlawful." *District of Columbia v. Wesby,* 583 U.S. 48, 63 (2018) (emphasis added).

To be clearly established, a rule or legal principle must be "settled law," meaning that "it is dictated by a controlling authority or a robust consensus of cases of persuasive authority." *Wesby*, 583 U.S. at 63 (quoting *Hunter v. Bryant,* 502 U.S. 224, 228 (1991); *Aschroft v. Al-Kidd,* 563 U.S. 731, 741-42 (2011) (quotation marks omitted). *See also, Irish v. Fowler,* 979 F.3d 65, 76 (1st Cir. 2020). "It is not enough that the rule is suggested by then-existing precedent." *Id.* The precedent

must be clear enough that "*every reasonable official* would interpret it to establish the particular rule the plaintiff seeks to apply." *Wesby,* 583 U.S. at 63 (citing *Reichle v. Howards,* 566 U.S. 658, 666 (2012). (emphasis added and quotations omitted).

Thus, if an objectively reasonable official in Young's shoes "might not have known for certain that [his] conduct was unlawful," then Young "is immune from liability." *Id.,* 927 F.3d at 583 (quoting *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017)).  "Evidence concerning the defendant's subjective intent is simply irrelevant" to the second step of the qualified immunity inquiry. *Crawford-El v. Britton,* 523 U.S. 574, 590 (1998).

> **(2)    Roussel's Right to Post Signs on a Rural, Privately Owned Road Was Not Clearly Established**

There is no controlling authority, nor a consensus of persuasive authority, that leads to the conclusion that Young can be denied qualified immunity. Young can find no authority in which the Supreme Court, the First Circuit, or the District of Maine have addressed the question of whether a member of the public has a constitutional right to place signs on the private property of another.

With regard to persuasive authority, and as discussed in greater detail above, the 6th Circuit in its *Brindley* opinion held that private streets can be traditional public fora. *See Brindley,* 934 F.3d at 468-69. However, *Brindley* and the cases that cite it are concerned with sidewalks and medians along urban streets, not unpaved rural roads such as Railroad Bed Road and Hancock Road. *See id. See also, Peters v. Metro. Government of Nashville and Davidson County, Tennessee,* 2024 WL 3826358, at *6 (M.D. Tenn. Aug. 14, 2024) (plaza adjacent to a sidewalk held not to be a traditional public forum); *McDonald,* 2024 WL 3566471, at * 25 (medians adjacent to city streets held to be non-public fora); *Blankenship v. Louisville-Jefferson County Metro Government, Kentucky,* 2024 WL 5012059, at *1, *5 (W.D. Kentucky December 6, 2024) (discussing avenue outside Churchill Downs in Louisville, Kentucky). Unlike urban or suburban streets, the roads at

issue in this case have no businesses, no public accommodations, no buffers such as sidewalks for protection or apparent invitation to the public such as would be found in the "urban grid" type properties discussed by the *Brindley* court. *Brindley,* 934 F.3d at 469; Exhibits 14-20.

Other Supreme Court cases addressing the question of whether public sidewalks are traditional public fora are distinguishable from this case for the same reasons discussed above, namely, that the roads in question are private and do not have sidewalks. *See Grayned v. City of Rockford,* 408 U.S. 104 (1972) (sidewalk adjacent to high school); *U.S. v. Grace,* 461 U.S. 171, 180 (1983) (sidewalk adjacent to Supreme Court); *Boos v. Barry,* 485 U.S. 312 (1988) (sidewalk adjacent to embassy); *Frisby v. Schultz,* 487 U.S. 474 (1988) (public street of a residential suburb in Milwaukee); *McCullen v. Coakley,* 573 U.S. 464, 134 S.Ct. 2518, 189 L.Ed.2d 502 (2014) (sidewalk near abortion facility)).

Against this precedential background, therefore, a reasonable official in Young's position could conclude that Roussel was not engaging in constitutionally protected First Amendment speech when he posted signs directed at Bill Mayo along Railroad Bed Road and Hancock Road. *Eves v. LePage,* 927 F.3d 575, 584-85 (1st Cir. 2019). Accordingly, Young is entitled to qualified immunity.

### D.    PUNITIVE DAMAGES

Punitive damages may be awarded in an action under § 1983 when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Cabral v. U.S. Dept. of Justice,* 587 F.3d 13, 24.  Based on the foregoing analysis and discussion of the record evidence, which Young repeats and reasserts here, Young contends that no reasonable jury could find that he was motivated

by "evil motive or intent" nor by "reckless or callous indifference" to Roussel's federally protected rights. *See id.*

## II.     MUNICIPAL LIABILITY

### A.     THE LEGAL STANDARD

As noted above, Roussel has sued Young both in his individual and official capacities. SMF 78. This is "tantamount to a suit against the entity of which the official is an agent;" in this case, Piscataquis County. *MacDonald v. Brewer School Dept.,* 651 F.Supp.3d 243, 269 (D. Me. 2023) (quoting *Burrell v. Hampshire Cnty.,* 307 F.3d 1, 7 (1st Cir. 2002) (quotation marks omitted).

If the court concludes that Young is not liable in his individual capacity to Roussel, then the County is similarly not liable. *See Wilson v. Town of Mendon,* 294 F.3d 1, 6 (1st Cir. 2002) (citing *Los Angeles v. Heller,* 475 U.S. 796, 798 (1986)). However, if the court does *not* grant summary judgment to Young on Roussel's § 1983 claims, then Roussel still "bears the burden of showing that, through its deliberate conduct, the [county] was the moving force behind the injury alleged." *Haley v. City of Boston,* 657 F.3d 39, 51 (1st Cir. 2011) (cleaned up).

To prove a § 1983 claim against Piscataquis County, Roussel must show that the County followed a policy or custom that was unconstitutional. *Burrell*, 307 F.3d at 7. "When an official policy exists that is unconstitutional on its face, the inquiry is straightforward." *Alston v. Town of Brookline*, 308 F. Supp. 3d 509, 533 (D. Mass. 2018). In the absence of an official policy, "[a] plaintiff may also show an 'unconstitutional municipal custom so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'" *Fincher v. Town of Brookline*, 26 F.4th 479, 485 (1st Cir. 2022) (quoting *Bordanaro v. McLeod*, 871 F.2d 1151, 1156 (1st Cir. 1989)).

### (1)    Piscataquis County Has No Official Policy Preventing People From Posting Signs On Public or Private Roads

Here, there is no official policy in Piscataquis County or the Piscataquis County Sheriff's Office of prohibiting people from posting signs on or adjacent to public or private roads, nor any policy of responding after the fact to people who have posted such signs. SMF 83.

### (2)    Piscataquis County Has No Custom or Practice of Preventing People From Posting Signs On Public or Private Roads

There is also no settled custom or practice in Piscataquis County or the Piscataquis County Sheriff's Office of prohibiting people from posting signs on or adjacent to public or private roads, nor any policy of responding after the fact to people who have posted such signs. SMF 84. During his tenure as Chief Deputy and Sheriff of Piscataquis County, Young knows of no person other than Roussel who has ever alleged that the Piscataquis County Sheriff's Office violated their First Amendment rights by responding to their posting of signs on or adjacent to a public or private road. SMF 80.  Likewise, during his tenure as Chief Deputy and Sheriff of Piscataquis County, Young knows of no person other than Roussel who has ever alleged that the Piscataquis County Sheriff's Office engaged in First Amendment retaliation by responding to their posting of signs on or adjacent to a public or private road. SMF 81. Moreover, Young is not aware of the Sheriff's Office ever having received a complaint about a person posting signs on or adjacent to a public or private road, other than the complaint at issue in this case. SMF 82.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Young respectfully requests that this Court grant summary judgment in his favor on all counts and dismiss the Second Amended Complaint with prejudice, plus costs and attorneys fees.

Date:   January 31, 2025

/s/ Peter Marchesi
Peter T. Marchesi, Esq.


/s/ Michael Lichtenstein
Michael D. Lichtenstein, Esq.

Wheeler & Arey, P.A.
Attorneys for Defendant Robert Young
27 Temple Street
Waterville, ME 04901

# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **JOSEPH ROUSSEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Docket No. 1:22-cv-00285** |
| | ) | |
| **WILLIAM MAYO, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE

I, Peter T. Marchesi, hereby certify that:

● Motion for Summary Judgment of Defendant Robert Young

has been served this day on Plaintiff by filing with the Clerk of Court using the CM/ECF system which will send notification of such filing(s) to the following:

| | |
|---|---|
| Michael E. Saucier, Esq. | *msaucier@lokllc.com* |
| Frederick Costlow, Esq. | *fcostlow@rwlb.com* |

Dated: January 31, 2022

/s/ Peter T. Marchesi
Peter T. Marchesi, Esq.
Wheeler & Arey, P.A.
Attorneys for Defendant Robert Young
27 Temple Street
Waterville, ME 04901