UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| JOSEPH F. ROUSSEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:22-cv-00285-SDN |
| | ) | |
| WILLIAM MAYO, SCOTT WILCOX, | ) | |
| RYAN BAILEY, LUCAS MURPHY, and | ) | |
| ROBERT YOUNG, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Joseph F. Roussel sued the city manager of Old Town, Maine, various Old Town police officers, and the Piscataquis County Sheriff for allegedly violating his First Amendment rights. This case began as a disagreement over the masking policy at the Old Town City Hall during the COVID-19 pandemic. But it developed into an acrimonious dispute, and the situation deteriorated further when Mr. Roussel did two things that are the subject of this Order: First, while passing by the city manager's lakefront house on his friend's boat, Mr. Roussel shouted expletives at the city manager. Second, Mr. Roussel posted strongly worded and expletive-laden signs on the side of the private road leading to the city manager's house. In response, the city manager enlisted Piscataquis County Sheriff Robert Young to serve Mr. Roussel with a cease harassment notice. Mr. Roussel claims that Sheriff Young, in doing so, violated Mr. Roussel's First Amendment and Maine state constitutional rights.

Sheriff Young now moves for summary judgment on Mr. Roussel's claims. For the following reasons, the motion is granted in part and denied in part.

## FACTUAL BACKGROUND[1]

Mr. Roussel is a resident of Orrington, Maine. DSMF ¶ 1; RSMF ¶ 1. In October 2021, while COVID precautions were still in effect, he called the City Hall in Old Town, Maine, seeking information about a property in Old Town he was interested in purchasing. ECF No. 74-1 at 31, 121:20; DSMF ¶ 5. Mr. Roussel first spoke with a secretary, ECF No. 74-1 at 31, 126:23, who told him that the City Hall required visitors to wear surgical masks, *id*. at 31, 127:9. However, Mr. Roussel wanted to wear a respirator instead of a surgical mask. *See id*. at 33. When he asked the secretary if he could wear a respirator, she transferred his call to the City Manager, William Mayo. *Id*. at 31, 134:8–24.

After Mr. Mayo got on the line, the call turned hostile. RSAF ¶ 6. Mr. Mayo would not permit Mr. Roussel to access the City Hall while wearing a respirator instead of a surgical mask. *Id*. ¶ 5. Mr. Mayo and Mr. Roussel began to argue and traded expletives: as Mr. Roussel later put it, they "were using adult language but acting like four year olds." ECF No. 74-1 at 35, 138:14–15; DSMF ¶ 5; RSAF ¶¶ 5–6.

After the call concluded, Mr. Mayo told the Old Town Chief of Police Scott Wilcox about the call. RSAF ¶ 6. As a result, Chief Wilcox issued a criminal trespass warning to Mr. Roussel, banning him from going to the City Hall. DSMF ¶ 69; RSAF ¶ 7.

---

[1] The Court draws the following background from the undisputed facts set out in the parties' statements of facts and responses thereto, ECF Nos. 72, 74–75, with any disputed facts reasonably resolved for the purposes of this motion in Mr. Roussel's favor, when supported by the record. *See Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018). For simplicity, I cite to Sheriff Young's statement of material facts (ECF No. 72) as the "DSMF"; to Mr. Roussel's response to the DSMF (ECF No. 74) as the "RSMF"; and Sheriff Young's response to Mr. Roussel's additional facts (ECF No. 76) as the "RSAF." I do not cite directly to Mr. Roussel's additional facts because the RSAF reprints those facts in full.

## I.    The City Hall Protest

Mr. Roussel believed that banning him from the City Hall was illegal, so he planned to engage in "civil disobedience" by going to the City Hall despite the trespass warning. ECF No. 74-1 at 38, 152:2–14. In November 2021, Mr. Roussel traveled to Old Town "fully intend[ing] to get arrested." *Id.* at 39; ECF No. 74-3 at 8. He stopped at the police station to let the police know that he planned to violate the trespass warning and to show them that he was unarmed. *See* ECF No. 74-1 at 39. Mr. Roussel then protested outside City Hall for two hours. ECF No. 74-3 at 8. However, after discussing his potential arrest with police officers, Mr. Roussel ultimately decided to leave without attempting to enter City Hall. *See* ECF No. 74-1 at 41.

## II.    The Lake Incident

The following summer, on June 25, 2022, Mr. Roussel was with his friends—who lived in the area—on their boat on Schoodic Lake, in Lake View Plantation, Maine. RSAF ¶ 1. As they happened to pass by a particular house on the lakeshore, one of Mr. Roussel's friends told him that Mr. Mayo lived there. *Id.* ¶ 2.; DSMF ¶ 4 ("Mayo owns a home on Schoodic Lake."). Mr. Roussel saw two people seated on the porch near the lakeshore at Mr. Mayo's home, and he assumed that one of them was Mr. Mayo. RSAF ¶¶ 9–10, 13. Mr. Roussel shouted at the people on Mr. Mayo's porch, "fuck you, try trespassing me from here you tyrant piece of shit," referencing the City Hall trespass warning from the previous fall. DSMF ¶ 6; RSAF ¶¶ 8–9, 15.[2]

Mr. Mayo was, in fact, sitting on his porch with a friend when Mr. Roussel passed by. RSAF ¶ 11. Mr. Mayo heard someone shouting at him but did not recognize who it was.

---

[2] The RSAF quotes Mr. Roussel as saying this phrase *without* the word "tyrant," but that is not supported by the cited portion of Mr. Roussel's deposition. In any event, I do not find the discrepancy material.

*Id*. ¶¶ 11–12. He could not hear everything Mr. Roussel said but did specifically hear the word "fuck." *Id.* ¶ 12.

### III.    The Sign Incident

A week later, on July 3, 2022, Mr. Roussel drove to Lake View Plantation to meet with friends who lived there. RSAF ¶¶ 17–18. Mr. Roussel spoke with them about posting signs on the roads nearby. *Id.* ¶ 19. After he left his friends' house, he posted five or six[3] signs near Mr. Mayo's home, along Hancock Road and Railroad Bed Road. DSMF ¶ 7; RSAF ¶¶ 25–26.

The signs displayed the following language in all capital letters[4]:

- FUCK YOU WILLIAM MAYO

- WILLIAM MAYO HATES FREE SPEECH RIGHTS AND LAWS MATTER MORE THAN YOUR FEELINGS SUCK IT

- SOMETIMES WHEN YOUR A TYRANT AT WORK THEY FIGURE OUT WHERE YOU LIVE AND SCOTT WILCOX CANT HELP

- WILLIAM MAYO SUPPORTS BIDEN ANOTHER SHIT BAG THAT HATES FREEDOM THE CONSTITUTION MATTERS MORE THAN YOUR LIMP DICK

- FREEDOM OF SPEECH MATTERS MOST WHEN YOU DONT LIKE IT FUCK YOU WILLIAM MAYO EAT A BAG OF DICKS

---

[3] Mr. Roussel recalled having posted six signs, but only five distinct signs appear in the record. He also expressed some confusion during his deposition about how many signs he posted. *See* ECF No. 74-1 at 13, 50:2–11. The number of signs is immaterial to the analysis so I need not decide whether this dispute is genuine. *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 19 (1st Cir. 2004) (explaining that a fact is material at summary judgment when it "has the potential of affecting the outcome of the case").

[4] *See* ECF Nos. 72-1 to 72-6. Photographs of the signs appear in an Appendix to this opinion.

The closest sign was located approximately 1,200 feet from Mr. Mayo's house, posted on a utility pole near the primary entrance into the subdivision. RSAF ¶ 53.



*Figure 1: Excerpt from ECF No. 72-7 indicating with hand-drawn stars where Mr. Roussel placed his signs. Mr. Mayo's house is indicated with an arrow.*

None of the signs were posted on the final access road to Mr. Mayo's property. *Id.* ¶ 55. Mr. Roussel himself never went closer than within 1,000 feet of Mr. Mayo's home when he posted the signs. *Id.* ¶ 54. Nor did Mr. Roussel confront—or even see—Mr. Mayo in person when he posted the signs. *Id.* ¶ 56.

Both Railroad Bed Road and Hancock Road are privately owned, gravel roads. DSMF ¶¶ 11, 15; RSMF ¶¶ 11, 15; RSAF ¶¶ 39–40. However, neither road had signs identifying them as private or suggesting the public could not use the roads. RSAF ¶¶ 38–40. Indeed, the public road which turns into the private Hancock Road has no stop sign or other indication that the road becomes private once it turns to gravel. *Id.* ¶ 39.

### IV.    The Aftermath

In the afternoon on July 3, 2022, Mr. Mayo emailed Guy Dow, who worked in the Piscataquis County Sheriff's office. ECF No. 74-4 at 10, 40:6–19. Mr. Mayo described his prior interactions with Mr. Roussel and included pictures of the signs Mr. Roussel had posted along the roads near Mr. Mayo's home. ECF No. 74-3 at 3.

On July 5, 2022, Piscataquis County Sheriff Robert Young called Mr. Mayo to follow up on the email. ECF No. 74–2 at 8, 29:9–10; *id.* at 6, 23:16–24; ECF No. 74-4 at 11, 43:19–44:4. They discussed the lake incident and the signs. Sheriff Young later told Mr. Roussel that he thought the sign referencing Scott Wilcox was unprotected speech that could be considered a threat, though it did not rise to the level of a "criminal threat." ECF No. 74-2 at 10, 39:10–40:22; *id.* at 7, 25:6–25. Accordingly, on the same day as his phone call with Mr. Mayo, Sheriff Young authorized and signed a cease harassment notice forbidding Mr. Roussel from "engaging, without reasonable cause, in any course of conduct with the intent to harass, torment or threaten" Mr. Mayo. DSMF ¶ 38; RSAF ¶ 61; ECF No. 74-3 at 2; ECF No. 74-2 at 10, 37:21–38:1. Mr. Roussel received the notice about two weeks later, on July 14, 2022, when he was served. DSMF ¶ 37; ECF No. 74-1 at 19, 73:21–74:8.

The next day, Mr. Roussel and Sheriff Young spoke by phone and discussed the basis for the cease harassment notice. RSAF ¶¶ 69–79. Sheriff Young declined to rescind the cease harassment notice at Mr. Roussel's request. *Id.* ¶¶ 89, 91–92.

## PROCEDURAL HISTORY

Representing himself, Mr. Roussel brought this lawsuit against Mr. Mayo and three other defendants on September 12, 2022. ECF No. 1. In his initial complaint, Mr. Roussel only raised claims stemming from the City Hall incident. He later filed a separate lawsuit against Mr. Mayo and Sheriff Young over the sign incident and cease harassment notice, *see Roussel v. Mayo*, No. 1:23-cv-00061 (D. Me.), but he voluntarily dismissed that case. Back in this action, Mr. Roussel moved to amend his complaint to assert the claims against Mr. Mayo and Sheriff Young regarding the sign incident and cease harassment notice, which he had originally brought in the separate action. ECF No. 32. The Court granted the motion to amend. ECF No. 41.

The Second Amended Complaint alleges five counts against Sheriff Young. Count I alleges Sheriff Young substantively violated Mr. Roussel's First Amendment rights; Count II alleges Sheriff Young retaliated against Mr. Roussel for his speech in violation of the First Amendment; Counts III and IV allege the same things, respectively, but under the Maine Constitution's speech protections; and Count V requests punitive damages. *See* ECF No. 42.

Sheriff Young moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). ECF No. 45. The Court denied the motion. ECF No. 53. Now, Sheriff Young moves for summary judgment on Mr. Roussel's claims. ECF No. 71.

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the case. *Tang v. Citizens Bank, N.A.*, 821 F.3d 206, 215 (1st Cir. 2016) (quoting *Pérez-Cordero v. Wal-Mart P.R., Inc.*, 656 F.3d 19, 25 (1st Cir. 2011)). The moving party "bears the initial burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020). That is, the moving party must "demonstrate an absence of evidence to support the nonmoving party's case." *Phair v. New Page Corp.*, 708 F. Supp. 2d 57, 61 (D. Me. 2010). Then, the burden shifts to the non-moving party to show "specific facts sufficient to deflect the swing of the summary judgment scythe." *Tang*, 821 F.3d at 215 (quoting *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)). Mere "conclusory allegations, improbable inferences, and unsupported speculation" will not suffice to create a genuine dispute of material fact. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92-93 (1st Cir. 2018) (quoting *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993)). Throughout, I must view the "record in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor." *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994).

## I.    Substantive First Amendment Claim

When a state actor violates someone's constitutional rights, 42 U.S.C. § 1983 provides a remedy.[5] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). To secure the remedy § 1983 creates, a plaintiff must show two things: First, that their constitutional rights were violated. Second, that the person who violated those rights was acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). The parties agree that Sheriff Young acted under color of state law at all times relevant to this case. ECF No. 71 at 4; *see also* Order, ECF No. 53 (denying Sheriff Young's motion to dismiss and finding Mr. Roussel adequately alleged Sheriff Young acted as a state actor). Only the constitutional question remains.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I. As a general matter, the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. C.L. Union*, 535 U.S. 564, 573 (2002) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)). In limiting the government's power over speech, "[t]he First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

---

[5] Section 1983 reads in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

To determine whether a speech regulation is constitutional, courts "must consider both the nature of the burden imposed by the law and the nature of the speech at issue." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025). I address the second question—the nature of the speech—first.

## A. The Nature of Mr. Roussel's Speech is Protected

The nature of the speech turns on whether the speech falls in one of the traditional categories "outside the scope of the First Amendment." *Id.* Those "well-defined and narrowly limited classes" of speech the First Amendment does not categorically protect include obscenity, defamation, fraud, incitement, true threats, and speech integral to criminal conduct. *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). For the reasons described below, no genuine issue of material fact is present to suggest any of Mr. Roussel's speech falls within those exceptions; as such, his speech is protected.

### 1. The Lake Incident

When Mr. Roussel passed by Mr. Mayo's home on the lake, he shouted at Mr. Mayo's porch, "fuck you, try trespassing me from here you tyrant piece of shit." *Id.* ¶¶ 8–9, 15; DSMF ¶ 6. That speech does not fall into any of the "well-defined and narrowly limited classes" of exceptions to the First Amendment's strong free speech guarantee. *Stevens*, 559 U.S. at 468–69 (quoting *Chaplinsky*, 315 U.S. at 571–72). Although the language used is crass and derogatory, it does not constitute incitement, defamation, or obscenity. *Counterman v. Colorado*, 600 U.S. 66, 73 (2023). Nor is it a true threat of violence. *Id.* Indeed, the Supreme Court has held that the First Amendment protects the right to shout at public officials, *City of Houston, Tex. v. Hill*, 482 U.S. 451, 461 (1987), and to use profanity, *see Cohen v. California*, 403 U.S. 15, 16 (1971) (jacket bearing the

words 'Fuck the Draft' was protected speech); *Hess v. Indiana*, 414 U.S. 105, 107 (1973) (shouting "we'll take the fucking street again" while police were attempting to clear a protest was protected). Accordingly, the content of Mr. Roussel's speech on the lake is protected.

Sheriff Young argues Mr. Roussel's speech on the lake is unprotected because it was "one-to-one" speech between Mr. Roussel and Mr. Mayo. ECF No. 71 at 9–10. In Sheriff Young's view, speech directed from one person at another in private lacks First Amendment protection. As an initial matter, there is no such categorical exception for one-to-one speech. Sheriff Young relies exclusively on a case in which the court denied habeas relief to a petitioner convicted for violating a domestic protection order. *McCurdy v. Maine*, No. 19-CV-00511, 2020 WL 1286206 (D. Me. Mar. 18, 2020). As the court recognized in that case, the Supreme Court has not "squarely addressed the issue." *Id.* at *8; *see also Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 204 (3d Cir. 2001) (Alito, Circuit Judge) ("There is no categorical 'harassment exception' to the First Amendment's free speech clause.").

In any event, I need not decide the issue here as undisputed facts in the record demonstrate that Mr. Roussel did not engage in one-to-one speech. Mr. Roussel was on the boat with at least one other friend, RSAF ¶ 2, and Mr. Mayo was on the shore with at least one other person, RSAF ¶¶ 9–10, 13. Therefore, even if the First Amendment did not protect one-to-one speech, that exception would not apply here.

### 2. *The Sign Incident*

As with the language shouted from the boat, albeit crude and offensive, the speech on Mr. Roussel's signs does not constitute incitement, defamation, obscenity, or any other type of speech outside the scope of First Amendment protection. *See Mahanoy Area Sch.*

11

*Dist. v. B. L. ex rel Levy*, 594 U.S. 180, 191 (2021) ("[W]hile [the juvenile] used vulgarity, her speech was not obscene as this Court has understood that term." (citing *Cohen*, 403 U.S. at 19–20); *Nichols v. Chacon*, 110 F. Supp. 2d 1099, 1110 (W.D. Ark. 2000), (holding that although speech at issue was "crude, insensitive, offensive, and disturbing to [the defendant's] sensibilities, it was not obscene under the relevant Supreme Court precedent, did not constitute 'fighting words,' and was protected as 'free speech' under the First Amendment") *aff'd*, 19 F. App'x 471 (8th Cir. 2001); *Forchion v. Gusciora*, No. CV 24-10052, 2025 WL 1924387, at *1 (D.N.J. July 14, 2025) (projection of phrase "Our City Government SUCKS" on city hall may be "crass and discourteous" but the phrase constitutes "neither lewd, obscene, nor libelous" speech outside the First Amendment's protection).

Sheriff Young briefly suggests that the sign stating, "SOMETIMES WHEN YOUR A TYRANT AT WORK THEY FIGURE OUT WHERE YOU LIVE AND SCOTT WILCOX CANT HELP" could be considered a true threat. *See* ECF No. 71 at 12 ("Young also testified that he believed that Roussel's sign . . . could be perceived as a threat."). However, Sheriff Young does not sufficiently develop this argument in his motion. He does not cite to any case law supporting his argument, explain how the signs are threatening, or demonstrate that Mr. Roussel subjectively understood the threatening nature of his speech.[6] *See Counterman*, 600 U.S. at 72–73. While both Sheriff Young and Mr. Roussel discuss Mr. Roussel's subjective intent in their depositions, Sheriff Young does not develop this

---

[6] Nor does Sheriff Young address the unsettled question of whether *Counterman*'s heightened recklessness standard for true threat prosecutions applies with equal weight to civil actions such as this one. *Compare Counterman*, 600 U.S. at 118–19 (Barrett, J., dissenting) ("Accordingly, the Court's holding affects the civil consequences for true threats just as much as it restricts criminal liability."), *with, e.g., Sealed Plaintiff 1 v. Front*, No. 22-cv-00670, 2024 WL 1395477, at *29 (E.D. Va. Mar. 31, 2024) (finding *Counterman* inapplicable to a civil lawsuit).

testimony into a legal argument in his briefs. Therefore, because Sheriff Young does not make any reasoned argument as to whether the content of Mr. Roussel's signs constitutes an unprotected true threat, I consider that argument waived. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *Me. Mar. Acad. v. Fitch*, 411 F. Supp. 3d 76, 85 (D. Me. 2019) ("While the court in *Spinks* makes an interesting argument as to why more than one employer could be held liable under the Jones Act, the Plaintiff does nothing to develop this argument and does not return to it in her Reply. As such, I consider this argument to be waived." (footnote omitted)).

### B. The Parties' Forum Arguments

Recall that to determine whether a speech restriction is constitutional, courts "must consider both the nature of the burden imposed by the [restriction] and the nature of the speech at issue." *Free Speech Coal.*, 145 S. Ct. at 2302. Having concluded that the nature of Mr. Roussel's speech is protected, I turn now to the first question. The parties argue this question turns on the forum in which Mr. Roussel spoke. Although ultimately this forum analysis is a red herring to my determination here, in order to best describe the parties' positions, I take a brief detour through the relevant law governing forum analysis.

To determine whether a speech restriction on government-owned property is constitutional, courts begin by identifying what type of forum the property represents. "A forum can be a traditional public forum, a designated public forum (sometimes called a limited public forum), or a non-public forum." *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002).

13

A traditional public forum is an "area that has historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (quotation modified). "Some spaces—such as public streets, sidewalks, and parks—are presumptively public fora, and in most cases no particularized inquiry into their precise nature is necessary." *Kinton*, 284 F.3d at 20; *Frisby v. Schultz*, 487 U.S. 474, 480 (1988) ("[W]e have repeatedly referred to public streets as the archetype of a traditional public forum.").

A non-public forum, as a term of art in this context, is a forum owned by the government, but nonetheless lacking any tradition or designation as a place for public communication. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983) ("*Public property* which is not by tradition or designation a forum for public communication is governed by different standards." (emphasis added)). For example, a state courtroom, despite being owned by the government and open to the public, is a non-public forum because its "function is to provide a locus in which civil and criminal disputes can be adjudicated," not to provide a space for public communication. *Berner v. Delahanty*, 129 F.3d 20, 26 (1st Cir. 1997).

A limited public forum falls in the middle between a traditional and a non-public forum: It is "government property that has not traditionally been regarded as a public forum[,] . . . intentionally opened up for that purpose." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009).

While the forum analysis almost exclusively applies to public property, *Berner*, 129 F.3d at 26 (explaining that forum analysis applies "when a plaintiff seeks to launch a First Amendment challenge addressed to a policy or practice that restricts expressive activity on public property"), the Supreme Court has long recognized that certain privately owned

locations bearing the hallmarks of traditional public fora are, despite their private ownership, classified as traditional public fora, *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939) ("Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions."); *Denver Area Educ. Telecommunications Consortium, Inc. v. F.C.C.*, 518 U.S. 727, 792 (1996) (Kennedy, J., concurring in part) ("Indeed, in the majority of jurisdictions, title to some of the most traditional of public fora, streets and sidewalks, remains in private hands.").

Each type of forum yields a different constitutional test for speech restrictions covering that forum. In either a traditional public forum or a limited public forum, the government may impose two types of restrictions: content-neutral time, place, and manner restrictions "narrowly tailored to serve some substantial government interest, [leaving] open adequate alternative channels of communication," *Kinton*, 284 F.3d at 20, or content-based restrictions that serve a compelling government interest by the least restrictive means, *March v. Mills*, 867 F.3d 46, 54 (1st Cir. 2017). The former standard is often referred to as intermediate scrutiny, the latter as strict scrutiny. *Id.* at 64. Strict scrutiny is more exacting: a compelling interest is stronger than a substantial government interest; the *least* restrictive means of furthering a government interest is narrower than a speech restriction that may leave open adequate alternative channels of communication.

In a non-public forum, the constitutional standard permits far more speech regulation. There, the government may impose any reasonable viewpoint-neutral time, place, and manner restriction. *Minnesota Voters All. v. Mansky*, 585 U.S. 1 (2018); *Kinton*, 284 F.3d at 20.

The parties frame the issue here—what burden the government may impose on Mr. Roussel's protected speech—as turning on the forum in which Mr. Roussel spoke. Sheriff Young argues that the roads on which Mr. Roussel placed his signs do not constitute a traditional public forum. He argues that the roads are privately owned and not the sort of private property bearing the hallmarks of public fora that must be treated as a traditional public forum. Mr. Roussel uses the same framing. He concedes the roads are privately owned, ECF No. 72 at 4 ("Defendant has established that the *fee* in the roads is private . . . ."), but argues the roads *do* bear the hallmarks of public fora and therefore should be treated as such.

Though Sheriff Young claims the roads are "something less than a public forum," ECF No. 71 at 9, he does not indicate what type of forum I actually should treat them as. There lies the trouble. If the roads are not a traditional public forum, what are they? They cannot be a non-public forum, because that designation only applies to government property, and it is undisputed that the roads are private. *See Perry Educ. Ass'n*, 460 U.S. at 46. Likewise, the roads cannot be a limited public forum because that designation, too, applies only to government property. *See Pleasant Grove City*, 555 U.S. at 469.

The other option, and the one that must apply here, is that the roads are not a "forum" at all. If they are privately owned but lack any characteristics of a traditional public forum, they are simply private property.[7] This point bears emphasis: The Supreme Court has consistently applied the forum analysis only to government property, with the

---

[7] Other courts have occasionally referred to such private property as a "private forum," *See Van Bergen v. State of Minn.*, 59 F.3d 1541, 1553 n.11 (8th Cir. 1995), but the First Circuit has not. Given that "non-public" and "private" may be used interchangeably in everyday speech, the term "private forum" risks suggesting that private property is more akin to a non-public forum than a traditional public forum, when in fact the opposite is true.

16

limited exception for private property bearing characteristics of a traditional public forum. *Mansky*, 585 U.S. at 11 ("[O]ur cases recognize three types of *government-controlled* spaces: traditional public forums, designated public forums, and nonpublic forums." (emphasis added)); *Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, 1222 (2021) (Thomas, J., concurring) (gathering cases for the same proposition); *see also Berner*, 129 F.3d at 26 (forum analysis applies "when a plaintiff seeks to launch a First Amendment challenge addressed to a policy or practice that restricts expressive activity on *public property*" (emphasis added)); *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1552 n.12 (7th Cir. 1986) (explaining that only "[t]he Supreme Court's analysis of *government* property turns upon the public forum/private forum distinction"), *aff'd*, 479 U.S. 1048 (1987). The forum analysis does not apply to purely private property.

The Supreme Court has delineated two standards under which courts must consider government restrictions on speech on private property. First, the government may impose content-neutral time, place, and manner restrictions that survive intermediate scrutiny. *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022). Second, the government may impose content-based restrictions but only if they survive strict scrutiny. *Free Speech Coal.*, 145 S. Ct. at 2302 (restrictions must be "the least restrictive means of achieving a compelling state interest" (quoting *McCullen*, 573 U.S. at 478)); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).

Notably, these two standards governing speech restrictions of private property almost perfectly align with the standards governing traditional public fora, and courts sometimes speak of them together. *See Van Bergen v. State of Minn.*, 59 F.3d 1541, 1553

17

n.11 (8th Cir. 1995) ("A private forum, such as a residence or office, or privately-owned telecommunications system, is more akin to a public forum than to a public property nonpublic forum for purposes of government regulation, and the same standard is logically applied to both."); *Ackerley Commc'ns of Mass., Inc. v. City of Cambridge*, 88 F.3d 33, 39 (1st Cir. 1996) ("Under the First Amendment, it is normally not within the government's power to decide who may speak and who may not, at least on private property *or* in traditional public fora." (emphasis added) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 676 (1994) (O'Connor, J., concurring in part))). I illustrate the overlap below:

|  | Traditional Public Forum | Pure Private Property |
|---|---|---|
| **Content-based speech restriction** | *Strict Scrutiny*: Regulation must be "the least restrictive means of achieving a compelling state interest." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014) | *Strict Scrutiny*: Regulation must be "the least restrictive means of achieving a compelling state interest." *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2302 (2025) (quoting *McCullen*, 573 U.S. at 478). |
| **Content-neutral speech restriction** | *Intermediate Scrutiny*: Regulation must be "narrowly tailored to serve a significant governmental interest and leave[] open ample alternative channels for communication of the information." *March v. Mills*, 867 F.3d 46, 64 (1st Cir. 2017). | *Intermediate Scrutiny*: Regulation must "further an important or substantial governmental interest" and may not "burden substantially more speech than is necessary to further those interests." *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 186 (1997) |

In short, the standard for content-based restrictions on speech is identical whether the regulated speech occurs on private property or in a traditional public forum. As I explain below, a reasonable jury could find facts demonstrating that Sheriff Young's decision to issue a cease harassment order was content based, thereby subjecting his

conduct to the highest form of scrutiny. Accordingly, I need not decide at this stage whether or not the private roads constitute a traditional public forum because, if a jury found Sheriff Young's decision was content based, the forum would not change the applicable legal standard.

### C. Classifying the Cease Harassment Notice

Here, summary judgment in Sheriff Young's favor is not appropriate because a reasonable jury could find that Sheriff Young's decision to issue a cease harassment notice was content based.

First, Sheriff Young testified at his deposition that he explained over the phone to Mr. Roussel that he issued the cease harassment notice "because of the signs, the nature of the signs, *the language that was used*, the fact that he went on private property and posted it when he didn't have permission to do so." ECF No. 74-2 at 11, 43:15–20. When asked whether his concerns were mostly about the language used in the signs, Sheriff Young responded, "The language was of concern, yes." *Id.* 43:24. Second, Sheriff Young testified that he would not have issued any order to Mr. Roussel over the language in some of the signs, but the language in others prompted him to do so. As to one sign, he testified, "I would not issue a summons just for that sign." ECF No. 74-2 at 9, 36:6. When asked if one of the other signs would constitute disorderly conduct on Mr. Roussel's part, and thereby justify the cease harassment notice, Sheriff Young testified "I think it could be." *Id.* at 9, 36:15. Third, Sheriff Young testified about his interpretation of one of Mr. Roussel's signs: "Well, my sense of that . . . is that *he was trying to convey* to Mr. Mayo that he was in a place now where the chief of police in Old Town can't help him . . . ." ECF No. 74-2 at 12, 46:7–13 (emphasis added).

19

Additional facts in the record, "if believed, could lead a reasonable jury to conclude" Sheriff Young issued the cease harassment order "because of disagreement with [Mr. Roussel's] message." *Kurland v. City of Providence*, No. 14-CV-524, 2020 WL 5821091, at *6 (D.R.I. Sept. 30, 2020). There were other signs on the same roads, but none prompted Sheriff Young to take any action. For example, there were multiple non-political signs concerning the road's use. ECF No. 72-8 (signs reading "Caution"; "25 MPH Please Slow Down"; "Ride Right on Pavement"; "ATVs Please Slow Down or Lose the Privilege of Using this Road"; and numerous directional signs with arrows pointing to snowmobile trails, and food and lodging nearby). In *Reed*, the Supreme Court held that a town ordinance distinguishing between "Temporary Directional Signs," "Political Signs," and "Ideological Signs" was facially content based. *Reed*, 576 U.S. at 164. That holding applies here, too. The distinction between non-political signs (like those directing traffic) and political signs (like Mr. Roussel's coarse criticism of Mr. Mayo) is content based.

As such, a reasonable jury could conclude Sheriff Young "target[ed] speech based on its communicative content," *id.* at 163, and responded to "particular speech"—some of Mr. Roussel's signs, but not other signs along the road or even all of Mr. Roussel's signs— "because of the topic discussed or the idea or message expressed," *id.* The jury could conclude, after resolving the facts, that Sheriff Young's cease harassment order was based on the content of Mr. Roussel's signs.

### D. Strict Scrutiny

If Sheriff Young's cease harassment order was content based, he would have to overcome a presumption of unconstitutionality, *see Reed*, 576 U.S. at 163, and establish that in issuing the cease harassment order he used "the least restrictive means of

achieving a compelling state interest," otherwise known as the strict scrutiny standard,[8] *Free Speech Coal.*, 145 S. Ct. at 2302 (quoting *McCullen*, 573 U.S. at 478); *see Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). Sheriff Young hints at the governmental interest in residential privacy. In his view, Mr. Roussel placed his signs on the roads close enough to Mr. Mayo's home to infringe on Mr. Mayo's privacy. *See* ECF No. 71 at 11 ("The fact that Roussel targeted Mayo near his residence also renders his speech constitutionally unprotected."). Sheriff Young cites to *Frisby v. Schultz*, 487 U.S. 474 (1988), in which the Supreme Court upheld a content-neutral ban on targeted residential picketing, to support his argument. There, anti-abortion protestors staged pickets directly in front of the home of a doctor who performed abortions. *Id.* at 476. The Court held that picketing in front of a private residence infringes on the resident's privacy interest; therefore, the government can regulate such speech in a content-neutral manner because the captive audience "cannot avoid the objectionable speech." *Id.* at 487. That such speech "inherently and offensively" intrudes on the special privacy of the home justifies regulation. *Id.* at 486.

Frisby is distinguishable in two ways. First, its reasoning is limited to content-*neutral* regulations. As the Court explained, "[t]he ordinance also leaves open ample alternative channels of communication and is content neutral. Thus, *largely because of its narrow scope*, the facial challenge to the ordinance must fail." *Frisby*, 487 U.S. at 488

---

[8] Relying on the presumption of unconstitutionality that attaches to content-based speech restrictions, other courts have declined to grant summary judgment to police officers after concluding a reasonable jury could find the officers restricted a protestor's speech in a content-based manner. *See Kurland v. City of Providence by & through Lombardi*, 711 F. Supp. 3d 57, 73 (D.R.I. 2024) ("Because a content-based restriction is presumptively unconstitutional, summary judgment is not appropriate for the defendants.").

(emphasis added). Here, by contrast, where a reasonable jury could conclude Sheriff Young's conduct was content based, *Frisby*'s reasoning does not apply by its own terms. Second, while the parties here disagree as to the precise location of the signs on the roadside, the undisputed record demonstrates Mr. Roussel did not post any signs directly outside Mr. Mayo's home. The closest sign was approximately 1,200 feet from Mr. Mayo's house. RSAF ¶ 53. Mr. Roussel himself never went closer than 1,000 feet to Mr. Mayo's home when he posted the signs. *Id.* ¶ 54. Nor did he confront—or even see—Mr. Mayo in person when he posted the signs. *Id.* ¶ 56. Based on these undisputed facts, the signs did not inherently intrude on Mr. Mayo's privacy in his home. Treating *Frisby* as permitting the government to restrict speech beyond the home's immediate surroundings would be inconsistent with its focus on picketing "narrowly directed at the household." *Frisby*, 487 U.S. at 486; *see also Gregory v. City of Chicago*, 394 U.S. 111, 111 (1969) (holding that protesting in residential neighborhoods is protected as a general matter).

Additionally, while there is certainly a government interest in "protecting the well-being, tranquility, and privacy of the home," *Carey v. Brown*, 447 U.S. 455, 471 (1980), the Supreme Court has held only that it rises to a "*significant* government interest," *Frisby*, 487 U.S. at 484 (emphasis added). That is a lower standard than the compelling interest required to justify a content-based restriction on speech. *Free Speech Coal.*, 145 S. Ct. at 2302. Therefore, when considering the state interest in protecting residential privacy beyond the limited context of *Frisby*'s facts, the Supreme Court has held that content-based restrictions on protests are unconstitutional. *Carey*, 447 U.S. at 462 (holding an anti-picketing ordinance unconstitutional because it contained an exception for labor picketing and rejecting argument that privacy concerns justified regulation); *cf. Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972) (holding an anti-

picketing ordinance unconstitutional under the Equal Protection Clause for the same reason). "Public-issue picketing, an exercise of basic constitutional rights in their most pristine and classic form, has always rested on the highest rung of the hierarchy of First Amendment values . . . ." *Carey*, 447 U.S. at 466–67 (quotation modified). Because a content-based speech restriction "cannot be upheld as a means of protecting residential privacy for the simple reason that nothing in the content-based . . . distinction has any bearing whatsoever on privacy," *id.* at 465, and a reasonable jury resolving disputed facts could find Sheriff Young issued a content-based speech restriction, summary judgment is inappropriate.

As I have explained above, the record includes sufficient evidence from which a fact finder could conclude that Sheriff Young's decision to issue a cease harassment notice was based on the content of Mr. Roussel's speech. *See Tatro v. Kervin*, 41 F.3d 9, 18 (1st Cir. 1994) (explaining that "in a § 1983 action alleging First Amendment violations by a police officer," the plaintiff "need only show that the officer's intent or desire to curb the expression was the *determining* or *motivating* factor" leading to the officer's conduct); *see Dolan v. Tavares*, No. CIV.A. 10-10249, 2011 WL 10676937, at *7 (D. Mass. May 16, 2011) ("[I]n deciding motions for summary judgment, it is widely recognized that questions of motive and intent will generally preclude a court from granting summary judgment."). Accordingly, Sheriff Young is not entitled to judgment as a matter of law on Mr. Roussel's First Amendment claim.

## E.  Qualified Immunity

Sheriff Young argues that qualified immunity protects him from liability even if his conduct violated the First Amendment. Conscious of the fact that "immunity is to be resolved at the earliest possible stage in litigation," I address Sheriff Young's argument

23

here. *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009); *see Hening v. Adair*, 644 F. Supp. 3d 203, 215 (W.D. Va. 2022) (addressing qualified immunity after denying summary judgment to defendant, but not granting summary judgment to plaintiff).

Qualified immunity protects government officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lopera v. Town of Coventry*, 640 F.3d 388, 396 (1st Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). The First Circuit follows a two-step approach to such claims at summary judgment: "First, the court must determine whether the plaintiff's version of the facts makes out a violation of a protected right. Second, the court must determine whether the right at issue was clearly established at the time of defendant's alleged misconduct." *McKenney v. Mangino*, 873 F.3d 75, 81 (1st Cir. 2017) (quotation modified). I have already found that Sheriff Young is not entitled to judgment as a matter of law on Mr. Roussel's First Amendment claims. Accordingly, I turn to the question of whether the right at issue was clearly established.

This step requires Mr. Roussel to "spotlight 'controlling authority' or 'a robust consensus of cases of persuasive authority' (if there is one) that forbade [Sheriff Young] from acting as he did." *Belsito Commc'ns, Inc. v. Decker*, 845 F.3d 13, 23 (1st Cir. 2016). There need not be a perfect match in the case law. *Id.* at 24 (explaining there is no need to show the "complained-about conduct is the spitting image of conduct previously deemed unlawful"). Instead, "the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law." *Id.* at 23 (quoting *Savard v. Rhode Island*, 338 F.3d 23, 28 (1st Cir. 2003) (en banc) (opinion of Selya, J.)).

This second step, by asking whether the relevant right is clearly established, focuses on the "objective legal reasonableness of an official's acts." *Crawford-El v. Britton*, 523 U.S. 574, 590 (1998). Accordingly, "[e]vidence concerning the defendant's subjective intent is simply irrelevant" to the second step of the defense. *Id.*; *see Mihos v. Swift*, 358 F.3d 91, 104 (1st Cir. 2004) (explaining that intent is relevant only at the *first* step when the underlying constitutional violation has a subjective element).

Here, the relevant right Mr. Roussel exercised is the right to speak on private property—or in a traditional public forum—free from content-based government sanction, absent a compelling government interest. That right is clearly established. "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. Accordingly, content-based restrictions on speech "are presumptively unconstitutional." *Reed*, 576 U.S. at 163. The case law has long made clear that to overcome that presumption, the restriction must be narrowly tailored to serve a compelling government interest. *See Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (explaining strict scrutiny standard for content-based restrictions on speech); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 403 (1992) (White, J., concurring) (referring to this standard as "settled law").

To be sure, the facts of this case are unusual. It is not clear from the record whether Mr. Roussel had permission to post his signs from the owners of the property. However, crucially, if the roads are private property as the parties agree, then "the choice of what speech to permit and what to reject is the private property owner's, *not the government's*." *Van Bergen*, 59 F.3d at 1553 n.11 (emphasis added). Neither Mr. Mayo nor Sheriff Young

owned the property on which Mr. Roussel placed his signs, so nothing permitted Sheriff Young to step in.

Accordingly, the record justifies a jury finding that Sheriff Young could be held liable for violating Mr. Roussel's First Amendment rights, and qualified immunity would not protect Sheriff Young. I deny summary judgment to Sheriff Young on Mr. Roussel's substantive First Amendment claim (Count I).

## II.    First Amendment Retaliation

To prove his retaliation claim against Sheriff Young, Mr. Roussel must show that "(1) [he] engaged in constitutionally protected conduct, (2) [he was] subjected to an adverse action by [Sheriff Young], and (3) the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield, Mass.*, 58 F.4th 512, 514 (1st Cir. 2023) (quoting *Falmouth Sch. Dep't v. Doe ex rel Doe*, 44 F.4th 23, 47 (1st Cir. 2022)). The third element asks, in other words, whether Sheriff Young acted with "retaliatory animus[,] . . . meaning that the adverse action against [Mr. Roussel] would not have been taken absent the retaliatory motive." *Id.* at 515 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019)).

The first element turns on the substantive First Amendment claim discussed above. As to the second element, Sheriff Young does not dispute that the cease harassment order constitutes an adverse action. Therefore, only the third element remains.

Sheriff Young argues he did not intend to inhibit Mr. Roussel's First Amendment rights. Rather, Sheriff Young thought Mr. Roussel did not have the right to post signs on the roads near Mr. Mayo's home, to shout at Mr. Mayo from the boat, or to use profanity like the word "fuck." *See* ECF No. 71 at 12. He argues he issued the cease harassment

notice based on those considerations alone—not because he intended to violate Mr. Roussel's right to free speech.

That argument does not preclude a finding of retaliatory animus. The retaliatory animus element is designed to protect government officials from liability for taking adverse action against someone when their motivation is wholly unrelated to the protected activity. For example, the Supreme Court held that the retaliatory animus element protected police from liability to a drunken partygoer who "initiated a physical confrontation" with a police officer, but claimed his subsequent arrest was motivated by his speech to the officer. *Nieves v. Bartlett*, 587 U.S. 391, 408 (2019). If no retaliatory animus was required, "[a]ny inartful turn of phrase or perceived slight during a legitimate arrest could land an officer in years of litigation." *Id.* at 404.

Here, Sheriff Young's subjective understanding as to the protected nature of the speech has no bearing on whether he intended to retaliate on the basis of the speech. A reasonable jury could find Sheriff Young issued the cease harassment notice based on the content of Mr. Roussel's signs. Accordingly, a reasonable jury could likewise find that Mr. Roussel's "protected conduct was a substantial or motivating factor" for Sheriff Young's adverse action. *Gattineri*, 58 F.4th at 514. Therefore, I deny summary judgment to Sheriff Young on Mr. Roussel's First Amendment retaliation claim (Count II).

### III.    Maine Constitutional Claims

Mr. Roussel claims Sheriff Young violated the Maine Constitution's speech protection, Me. Const. Art. I, § 4, in addition to his First Amendment claims. He invokes 14 M.R.S. § 4682 (2025), part of the Maine Civil Rights Act, for relief on his Maine

constitutional claims.[9] Section 4682 creates the *only* private cause of action to sue for violations of rights secured by the Maine Constitution. *Andrews v. Dep't of Env't Prot.*, 1998 ME 198, ¶ 23, 716 A.2d 212, 220 (concluding article I, § 4 of the Maine Constitution does not create a private cause of action). However, § 4682 has always included significant limitations on the scope of that cause of action. The version of the statute in effect until 2023 permitted a plaintiff to sue only when someone interfered with their rights "by physical force or violence, damage or destruction of property, trespass on property, or threats thereof." *Id.*; *see* 14 M.R.S. § 4682 (2001). In 2023, the Maine legislature amended the statute to include one more category: "Engaging in any conduct that would cause a reasonable person to suffer emotional distress or to fear death or bodily injury . . . ." 14 M.R.S. § 4682(1-A)(B)(5) (2025). Accordingly, § 4682 now provides that a person may sue when any other person:

> Intentionally interferes or attempts to intentionally interfere with [their] exercise or enjoyment [of their federal or state constitutional] rights by:
>
> (1) Physical force or violence against a person; (2) Damage or destruction of property or trespass on property; (3) Threatening physical force or violence against a person; (4) Threatening damage or destruction of property or trespass on property; or (5) Engaging in any conduct that would cause a reasonable person to suffer emotional distress or to fear death or bodily injury to that person or to a close relation.

14 M.R.S. § 4682(1-A)(B). In other words, a plaintiff may only sue when someone interferes with their constitutional rights by engaging in real or threatened violence, damage to property, or trespass, or by engaging in objectively distressing conduct.

---

[9] While the disposition of a 42 U.S.C. § 1983 claim for violations of a federal right also controls a claim under the Maine Civil Rights Act for violations of that federal right, *Berube v. Conley*, 506 F.3d 79, 85 (1st Cir. 2007), the disposition of a § 1983 claim "does not necessarily control a plaintiff's claims under the Maine Civil Rights Act that [their] rights under the Maine Constitution were violated because state constitutional claims cannot be brought under section 1983," *Johnson v. City of Biddeford*, 665 F. Supp. 3d 82, 124 n.32 (D. Me. 2023), *aff'd*, 92 F.4th 367 (1st Cir. 2024).

The record does not reflect any of those circumstances here. Sheriff Young did not use physical force, damage property, trespass on property, or threaten to do any of those things. Nor did he engage in conduct "that would cause a reasonable person to suffer emotional distress or fear death or bodily injury." *Id.* No reasonable jury could find to the contrary. Accordingly, Mr. Roussel may not sustain a private cause of action for violations of Article I, § 4 of the Maine Constitution against Sheriff Young.

To be sure, as substantive matter the Maine Constitution is "no less restrictive" of governmental encroachment on free speech than the United States Constitution. *State v. John W.*, 418 A.2d 1097, 1101 (Me. 1980). Nevertheless, the Maine legislature has limited the *civil remedies* available for violations of the Maine Constitution, and I may not "expand the available remedies for a violation of rights guaranteed by the Maine Constitution beyond those which the Legislature in its wisdom has provided." *Andrews*, 1998 ME 198, ¶ 23, 716 A.2d at 220; *Doyer v. RSU 16*, No. 14-cv-00025, 2014 WL 4100942, at *6 (D. Me. Aug. 18, 2014) (citing *Andrews* for the same proposition); *Donovan v. Magnusson*, No. CIV. 04-102, 2005 WL 757585, at *17 (D. Me. Mar. 11, 2005) (same).

Accordingly, Sheriff Young's motion for summary judgment is granted as to Counts III and IV.

## IV.    Punitive Damages

In Count V, Mr. Roussel raises an independent claim for punitive damages. "Punitive damages, however, do not constitute a separate cause of action, but instead form a remedy available for some tortious or otherwise unlawful acts." *S. Port Marine, LLC v. Gulf Oil Ltd. P'ship*, 234 F.3d 58, 64 (1st Cir. 2000). Therefore, because punitive damages do not constitute an independent cause of action, I grant summary judgment to

Sheriff Young on Count V. I defer ruling on the availability of punitive damages as a *remedy* until after trial. *See Rocque v. Zetty, LLC*, 456 F. Supp. 3d 257, 267 (D. Me. 2020).

## V.    Municipal Liability

Because Mr. Roussel sued Sheriff Young in his official capacity in addition to his individual capacity, this lawsuit "is tantamount to a suit against the entity of which [Sheriff Young] is an agent." *Burrell v. Hampshire Cnty.*, 307 F.3d 1, 7 (1st Cir. 2002). Though "municipalities are not vicariously liable under section 1983 for the actions of their non-policymaking employees," *Haley v. City of Bos.*, 657 F.3d 39, 51 (1st Cir. 2011), they may be liable for the conduct of an official "responsible for establishing final government policy respecting such activity," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).[10] "Whether an official had final policymaking authority is a question of state law." *Id.*

Mr. Roussel argues that because Sheriff Young is the chief law enforcement officer of Piscataquis County, he had final policymaking authority. "Sheriffs are constitutional officers elected by the people of their respective counties . . . ." *Hilderbrand v. Washington Cnty. Comm'rs*, 2011 ME 132, ¶ 11, 33 A.3d 425, 429. Maine law provides that the "sheriff shall act as the chief county law enforcement officer and is responsible for administering and directing the sheriff's department as authorized by the country budget." 30-A M.R.S. § 401(1). While sheriffs are subject to budgetary oversight by county

---

[10] Sheriff Young focuses his argument exclusively on whether he acted pursuant to an unconstitutional custom or practice. While a "custom or practice" can form the basis for municipal liability, it is not the only way. A municipality can be held liable for either "a municipal policy *or* custom." *Tardiff v. Knox Cnty.*, 397 F. Supp. 2d 115, 128 (D. Me. 2005) (emphasis added) ("Unlike a 'policy,' which comes into existence because of the top down affirmative decision of a policymaker, a 'custom or practice' develops from the bottom up."). A policy can either be a formally adopted written policy, or "a single act of a municipal official with final policymaking authority." *Id.* Accordingly, when a plaintiff relies on a "policy" theory of municipal liability, they need not show a "custom or practice." That is simply "another basis" for liability. *Id.*

commissioners and must "obey all orders relating to law enforcement which they receive from the Governor," *Id.* § 401(2), (4), the Maine Supreme Judicial Court has "broadly construe[d]" county sheriffs' authority, *Hilderbrand*, 2011 ME 132, ¶ 19, 33 A.3d at 431.

In addition, this Court has previously found that county sheriffs exercise final policymaking authority in multiple areas. *See Faas v. Washington Cnty.*, 260 F. Supp. 2d 198, 206 (D. Me. 2003) (referring to the Sheriff of Washington County as the "official with final policymaking authority" over the county jail); *Giguere v. Ridlon*, No. CIV. 94-375, 1995 WL 626356, at *2 n.1 (D. Me. Sept. 21, 1995), *aff'd*, 98 F.3d 659 (1st Cir. 1996) ("The County faces liability along with the Sheriff because the Sheriff is the policy making authority on [employee discipline matters] for the County."). Nothing the record or the law indicates Sheriff Young does not have final policymaking authority when it comes to routine police work such as issuing a cease harassment order. Accordingly, I deny Sheriff Young summary judgment as to Mr. Roussel's official capacity—and therefore municipal liability—theory of recovery.

## CONCLUSION

For the foregoing reasons, Sheriff Young's motion for summary judgment is **GRANTED IN PART** as to Counts III, IV, and V and **DENIED IN PART** as to the remaining counts. I also deny summary judgment on Mr. Roussel's municipal liability theory of recovery.

**SO ORDERED.**

Dated this 6th day of August, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**

31

# APPENDIX



*Figure 2: Excerpt from ECF No. 72-1*



*Figure 3: Excerpt from ECF No. 72-2*



*Figure 4: Excerpt from ECF No. 72-3*



*Figure 5: Excerpt from ECF No. 72-5*



*Figure 6: Excerpt from ECF No. 72-6.*